716 F.2d 1322
 14 Fed. R. Evid. Serv. 40
 Dorine HERNDON, Personal Representative of the Estate of
Charles Herndon, Deceased, and Stellaretta
O'Donnell, Personal Representative of
the estate of Thomas
O'Donnell, Deceased,
Plaintiffs,
v.
SEVEN BAR FLYING SERVICE, INC., Plaintiff-in-Intervention-Appellee,
v.
PIPER AIRCRAFT CORPORATION, Defendant-Appellant,
Mitchell Industries, Inc., Third Party Defendant.
 No. 81-1805.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 2, 1983.
Rehearing Denied Nov. 10, 1983.
 
 Robert P. Smith, Law Offices of L.B. Ullstrom, Denver, Colo., for plaintiff-in-intervention-appellee.
 W.R. Logan, Civerolo, Hansen & Wolf, P.A., Albuquerque, N.M. (Cynthia A. Fry, Civerolo, Hansen & Wolf, P.A., Albuquerque, N.M., with him on the briefs), for defendant-appellant.
 Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 This is a suit based on manufacturer's liability. It arose out of an airplane accident. Thomas O'Donnell, deceased, was a student who was practicing instrument flying. He was piloting a Piper Aztec Aircraft. He wore a visor-like hood to simulate night or poor weather flying--he could see his instruments, but was unable to see outside the plane. His instructor on the flight, Charles Herndon, was an employee of Seven Bar Flying Service, Inc. ("Seven Bar"). The accident occurred on the night of February 26, 1975, in Bernalillo County, near Albuquerque, New Mexico.
 
 
 2
 The original action was brought by the widows of O'Donnell and Herndon. The complaint was filed in the District Court of Santa Fe County, New Mexico, on February 13, 1978, by Dorine Herndon, personal representative of the estate of Charles Herndon, and by Stellaretta Bolton (formerly Mrs. Thomas O'Donnell), personal representative of the estate of Thomas O'Donnell. The Piper Aircraft Corporation ("Piper") was named as a defendant. Seven Bar, which is the appellee here, intervened. It sought recovery for the loss of its aircraft and indemnification resulting from its settlement of a wrongful death suit made earlier with Stellaretta O'Donnell.
 
 
 3
 On March 24, 1978, Piper removed the cause to the Federal District Court. Thereafter the case went to trial and Piper's appeal is from the judgments which were entered thereon.
 
 
 4
 The equipment which was alleged to have caused the crash is called the pitch trim switch. It is located on the pilot's wheel. Plaintiffs relied on evidence that the pitch trim mechanisms were in the nose-down position. Their contention was that the pitch trim switch had a defective spring which caused it to hang up. Plaintiffs maintained that when O'Donnell had used the switch to modify the plane's attitude the switch had stuck. Thereupon the plane went into a full dive. Neither O'Donnell nor Herndon could correct this and the crash occurred.
 
 
 5
 The pitch trim switch, as originally designed, used a sponge-like silicone pad underneath the rocker switch to cause it to return to the neutral position as soon as a pilot stopped applying pressure to it. In order to avoid the problems resulting from the switch sticking or hanging up, Piper modified the design. It replaced the silicone pad with two small, linked coil springs. The owners of the aircraft which had the old design were told by Piper about the necessary modifications. This was through Piper Service Bulletin 331, which was issued in 1971. Reports which followed revealed that the switch still had a tendency to hang up, so Piper again made a modification of the switch's design. It did so by shortening the coil springs. Through Piper Bulletin 527, issued November 5, 1976, the owners were told to modify the springs they had installed under Bulletin 331, by cutting away a portion of each spring's coil.
 
 
 6
 Plaintiffs introduced into evidence Piper Service Bulletin 331, issued prior to the accident, and Piper Service Bulletin 527. The latter had been published over a year after the accident. At a pretrial conference, as well as during trial, Piper objected to admission of its Service Bulletin 527. Their argument was that as a subsequent remedial measure it was inadmissible under Rule 407 of the Federal Rules of Evidence. Plaintiffs' response was that the bulletin was admissible; that Rule 407 applied only to negligence cases and not to strict liability. It was relevant and was necessary to satisfy plaintiffs' burden on the issues of design defect, availability, cost and practicality. In a bench conference Piper conceded that it designed the switch. It also admitted the feasibility of the modifications. At the same time, however, Piper refused to stipulate to feasibility of the change. Indeed, at trial Piper denied the existence of a defective design. Piper's position at trial was that Herndon and O'Donnell's negligence in flying inattentively and in failing to react properly to any possible trim switch hang up caused the accident. As an alternative to forbidding admission of the bulletin, Piper originally requested the court to give a limiting instruction, but Piper neither included a limiting instruction in its requested instructions, nor did it object to the absence of such an instruction.
 
 
 7
 The trial court allowed plaintiffs to mention the service bulletin in opening arguments. It also admitted the bulletin into evidence during the trial. Plaintiffs also sought to admit Airworthiness Directive 77-09-10 issued by the Federal Aviation Administration which required Piper Aztec owners to make the trim switch modification described in Bulletin 527 within 100 flight time hours. Plaintiffs also attempted to introduce a similar FAA directive, No. 71-12-05, which was issued to make mandatory the Bulletin 331 modification.
 
 
 8
 The court sustained Piper's objection to these directives. Its reason was that under Rule 403 their probative value was outweighed by the possible "prejudicial conclusion of an unsafe condition made by someone in the FAA" following the Agency's "unspecified investigation." The court felt there was no need to risk the prejudicial affect the directives might produce since the Piper Service Bulletins it had admitted covered essentially the same ground and thus overemphasized the matter.
 
 
 9
 The court also limited plaintiffs' attempts to offer the testimony of other pilots who had experienced in-flight emergencies. To avoid cumulative evidence, plaintiffs were permitted only to read the transcript of one pilot's testimony to rebut testimony of pilots offered by Piper.
 
 
 10
 The trial lasted for thirteen days. The jury was instructed on both theories of recovery, that is negligence and strict liability. The jury could have found Piper negligent for failure to use ordinary care by designing a trim switch that was susceptible to malfunctioning or by failing to install a trim interrupt or disconnect system. Alternatively, the jury could hold Piper strictly liable for designing a trim switch that was unreasonably dangerous or for omitting a trim interrupt or disconnect system and for failing to warn owners adequately of the danger.
 
 
 11
 The jury was also instructed that Piper asserted the defense of contributory negligence on the part of O'Donnell and Herndon in failing to use ordinary care in planning and executing their training flight.
 
 
 12
 The jury determined that O'Donnell and Herndon were each 10% responsible for their accident and that Piper's liability was 80%. The jury calculated that Piper owed Herndon $229,000 and O'Donnell $380,000. There was some uncertainty whether the jury meant that Piper's 80% liability to Herndon and O'Donnell totalled $229,000 and $380,000, respectively, or whether those sums equaled the total of plaintiffs' damages. The court and counsel resolved that problem by treating the awards as the total damages and reducing them by 20%, and ordering Piper to pay Herndon's estate $183,200 and O'Donnell's estate $232,000, plus 80% of their taxable costs.
 
 
 13
 Regarding Intervenor Seven Bar's claims for property damages from the loss of its aircraft and for indemnity for its settlement with Mrs. O'Donnell, based on the settlement agreement between Mrs. O'Donnell and Seven Bar, and the New Mexico Court of Appeals decision in Claymore v. City of Albuquerque, No. 4804/4805 (N.M.Ct.App. Dec. 9, 1980), reprinted in Scott v. Rizzo, 96 N.M. 682, 634 P.2d 1234 (1981), the court determined that Piper should indemnify Seven Bar for 80% of the $110,000 settlement with Mrs. O'Donnell ($72,000). The undisputed value of the aircraft was $49,750, which the court reduced by 20% to arrive at the amount Piper owed Seven Bar for property damages. Piper was ordered to pay Seven Bar $111,800 plus 80% of its taxable costs.
 
 
 14
 Piper moved for judgment notwithstanding the verdict, and, in the alternative, for a new trial. Both motions were denied, and this appeal followed.
 
 ISSUES
 
 15
 1. Did the trial court err when it admitted a service bulletin issued by Piper over a year following plaintiffs' accident? This was pertaining to Federal Rule of Evidence 407.
 
 
 16
 2. Did the trial court err when it apportioned the damages between tort feasors in accordance with a settlement agreement and the jury's determination of the tort feasors' percentage of comparative fault?
 
 
 17
 We have considered the issues which are presented to us and note that they are, for the most part, trial issues. The exception is the indemnity issue which we will take up after having considered the principal evidentiary problem which is relied upon for reversal.
 
 Rule 407 in a Products Liability Case
 
 18
 Did the admission of the service bulletin issued by Piper more than a year after the accident constitute error? We conclude that it did not. The ultimate question here is: Did the trial court comply with Rule 407 of the Federal Rules of Evidence?
 
 
 19
 Procedural issues generally are governed by federal law. However, we need not determine whether the present evidentiary matter is procedural. Here we need only decide that the evidence in question is admissible. Fed.R.Evid. 1101(b); Rigby v. Beech Aircraft Co., 548 F.2d 288, 291-93 (10th Cir.1977); See also, Grenada Steel Indus., Inc. v. Alabama Oxygen Co., 695 F.2d 883, 885 (5th Cir.1983). The trial court, in exercising its discretion regarding admissibility, must examine the background of the rule together with the rule itself. The court may also look to the reasoning employed by other circuit, district or state courts in reaching their decisions. See Hartford v. Gibbons and Reed Co., 617 F.2d 567, 569 (10th Cir.1980); Cottonwood Mall Shopping Center, Inc. v. Utah Power and Light Co., 440 F.2d 36, 40 (10th Cir.), cert. denied, 404 U.S. 857, 92 S.Ct. 107, 30 L.Ed.2d 99 (1971). No New Mexico court has yet addressed the issue of admissibility of subsequent repair evidence in a strict liability case. We therefore apply Rule 407 of the Rules of Evidence.
 
 
 20
 In reviewing the trial court's decision to admit or to exclude evidence, this court looks not only to the propriety of the trial court's legal reasoning, it also considers the trial court's evidentiary decision as a whole; that is, in the context of the entire trial record. Prudential Insurance Co. of America v. Faulkner, 68 F.2d 676, 678 (10th Cir.1934). If the record were to indicate that the trial court set forth inadequate reasons or no reasons for its evidentiary decision, this court would examine the record to determine whether the facts supported the trial court's decision. Sims Consolidated, Ltd. v. Irrigation and Power Equipment, Inc., 518 F.2d 413, 418 (10th Cir.1975). An error in either admitting or excluding evidence does not justify the setting aside of a verdict or the granting of a new trial unless the error affected the substantial rights of the parties. Rule 61, Fed.R.Civ.Proc.; Harris v. Quinones, 507 F.2d 533 (10th Cir.1974).
 
 
 21
 In reviewing the trial court's decision, we conclude that the court looked not only to proper legal reasoning, but also the trial court correctly considered the total trial record in passing on the present question.
 
 
 22
 The trial court's ruling that Service Bulletin 527 was admissible was based on Rule 407. That bulletin is not unlike an automobile manufacturer's recall letter. The owners of Piper Aztec airplanes were told that despite replacing the pitch trim switch's original silicone pad with coil springs, Piper had reports that the trim switch still had a tendency to hang up in either the nose-up or nose-down position. Piper recommended that the remedy was to cut one quarter coil off the end of each of the linked coil springs underneath the rocker switch. The switch and its springs were depicted in a large cut-a-way illustration, and owners and their mechanics were given a step-by-step procedure to follow in order to make the correction. This bulletin was not issued until over a year after O'Donnell and Herndon's accident.
 
 Rule 407 provides:
 
 23
 When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.
 
 
 24
 The rule is pretty much a codification of the common law rule which excluded remedial measures taken after an accident. Scant legislative history together with uncertainty over some of the terms and the breadth of the exceptions, for instance where evidence may be used to impeach or to prove feasibility, has produced a split of authority on the question of acceptance into evidence of such a document as Bulletin No. 527 in products liability suits.
 
 
 25
 Some courts apply Rule 407 to strict liability product manufacturer cases, as well as to negligence cases. (For a complete citation of all the authorities see the attached Appendix.) A policy reason for excluding evidence of subsequent repairs is the desire to foster Rule 407's underlying purpose of encouraging tort feasors to take steps to remedy a hazardous condition in their control. The rule can be seen to assure manufacturers, for example, that the admissions which they make in issuing a recall letter will not be used as evidence of their negligence by plaintiffs with claims arising from circumstances before the corrective steps were taken. Another justification for this exclusionary rule is that evidence of subsequent remedial measures is irrelevant and confusing. It can be irrelevant because the reason defendant took these remedial measures is sometimes uncertain. Such evidence can be confusing because the jury has to focus on the circumstances at the time of the accident, so subsequent occurrences may be misleading.
 
 
 26
 Other courts have rejected the use of Rule 407 in products liability cases. These courts discount the policy argument underlying Rule 407 as applied to product manufacturers on several grounds. Principally, the public policy which underlies imposing liability for defendants' negligence is at odds with the purposes behind strict liability. Restatement (Second) of Torts, 402 A (1965); W. Prosser, Handbook of the Law of Torts, Sec. 103, at 671-72 (4th ed. 1971). In negligence actions, the jury's focus is on defendants' conduct. Exclusion of evidence of subsequent conduct under Rule 407 is appropriate because it fosters the principle of assessing liability based on the reasonableness of defendants' conduct at the time of the accident at issue. Rule 407's exclusion of evidence, however, is inappropriate in actions against defendants who are pursuing activities for which society has decided to assess strict liability. For instance, in strict liability regimes such as New Mexico, society chooses to place responsibility for the potential losses from producing an unsafe airplane with the manufacturer, regardless of the reasonableness of the manufacturer's design decisions. In actions against such manufacturers, therefore, the jury's sole inquiry is on the product. Employing Rule 407 to exclude evidence of the product's safety that is relevant and not prejudicial, as determined under Rules 401 and 403, would thwart the policies that underlie strict liability by an illogical imposition of a negligence-based rule of evidence. D.L. by Friederichs v. Huebner, 110 Wis.2d 581, 329 N.W.2d 890, 903 (1983).
 
 
 27
 On a more practical level, several courts have observed that it is unrealistic to think a tort feasor would risk innumerable additional lawsuits by foregoing necessary design changes simply to avoid the possible use of those modifications as evidence by persons who have already been injured. Furthermore, insurors would not tolerate their insured manufacturers refusing to take remedial measures. Governmental agencies, as well as juries contemplating punitive damage claims, would also be unlikely to approve of such callous behavior. Finally courts note that there is no evidence which shows that manufacturers even know about the evidentiary rule or change their behavior because of it.
 
 
 28
 Courts have also dismissed the possibility of confusing the jury with evidence of post-accident remedies. This is said to be a danger that should be considered by trial courts in the same manner that Rule 403 requires them to judge all evidence to determine its probative value and to ascertain whether its probative value is outweighed substantially by any possible prejudice. Such evidence is unquestionably "relevant," as that term is defined by Rule 401, so there is no justification for excluding it under Rule 407 where the trial court determines that the potential of the evidence to confuse or prejudice the jury does not substantially outweigh its probative value.
 
 
 29
 There are two recent decisions which ought to be considered. Grenada Steel Indus., Inc. v. Alabama Oxygen Co., 695 F.2d 883 (5th Cir.1983) and D.L. by Friederichs v. Huebner, 110 Wis.2d 581, 329 N.W.2d 890 (1983). Both pertain to Rule 407 in relationship to strict liability and product manufacturer cases. Both of these decisions have considered carefully the Rule's language and legislative history, and the opinions of other courts and various legal scholars. They came to opposite conclusions.
 
 
 30
 The Fifth Circuit in Grenada Steel relied on both the deterence of voluntary remedial measures and the jury confusion rationales to hold that evidence of subsequent remedial measures could not be admitted against the manufacturer and supplier of an acetylene gas cylinder which exploded and caused a very destructive fire. The court acknowledged the existence of contrary precedent, starting with the state court decision in Ault v. International Harvester Co., 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1979), and most notable in a string of Eighth Circuit decisions culminating in Unterburger v. Snow Co., 630 F.2d 599, 603 (8th Cir.1980). Nevertheless, the Fifth Circuit felt that it could not know with any certainty whether manufacturers relied on Rule 407 in making post-accident decisions. Therefore, the court in Grenada Steel chose not to risk dissuading manufacturers from taking subsequent remedial measures and refused to admit such repairs.
 
 
 31
 That policy decision, however, was not the principal basis for the Grenada Steel decision. Instead the court relied primarily on the relevance rationale for excluding evidence of subsequent remedial measures:
 
 
 32
 [O]ur decision does not rest only on theses about the influence of possible tort liability or human conduct. It rests more firmly on the proposition that evidence of subsequent repair or change has little relevance to whether the product in question was defective at some previous time. 695 F.2d at 887.
 
 
 33
 * * *
 
 
 34
 * * *
 
 
 35
 Interpreted to require the evidence to focus on the time when the product was sold, Rule 407 would conform to the policy expressed in Rule 403, the exclusion of relevant information if its probative value is substantially outweighed by the danger of confusion. 695 F.2d at 888.
 
 
 36
 We are unpersuaded by the Grenada Steel court's reasons for excluding evidence under Rule 407 in a strict liability case. As discussed above, the policy argument underpinning Rule 407 cannot logically be extended to strictly liable defendants. The reasonableness of their conduct is not at issue, so there is no reason to exclude evidence of their conduct.
 
 
 37
 The Fifth Circuit's relevancy rationale is similarly unconvincing. Under Rule 401, evidence is "relevant" if it has any tendency to make the existence of a fact more or less probable than it would be without the evidence. Evidence of subsequent repairs is thus relevant because a possible inference the jury can draw is that the product at issue was defective before defendant implemented the remedial measures. That does not mean such evidence is automatically admissible. The trial court must still weight the evidence's potential for prejudice against its probative value under Rule 403.
 
 
 38
 The Fifth Circuit's discussion of the feasibility exception to Rule 407 should be noted. Immediately following the ruling quoted above, the court recognized that the challenged evidence regarding later design modifications could have been admitted if the feasibility of making design changes had been "controverted." The difficulty with this exception to Rule 407 when a manufacturer merely states that its product was safe at the time of the accident without expressly admitting the ease of safer alternatives is determining whether the manufacturer "controverted" the "feasibility of precautionary measures."
 
 
 39
 The Fifth Circuit endorsed the reasoning in 23 C. Wright & K. Graham, Federal Practice & Procedure, Sec. 5288, at 144 (1980):
 
 
 40
 "The administration of Rule 407 would be greatly simplified if the appellate courts were to hold that all of these [negligence and product liability] situations, feasibility of precautionary measures will be deemed 'controverted' unless defendant manufacturer is prepared to make an unequivocal admission of feasibility." 695 F.2d at 888.
 
 
 41
 In other words, unless a manufacturer expressly concedes that at the time of the accident it would have been possible to make a safer product, the manufacturer should be deemed to dispute that fact and plaintiff should be able to present evidence of later remedial measures to show their feasibility prior to the accident.
 
 
 42
 Plaintiff in Grenada Steel did not ask defendant-manufacturer to make such an admission, so the Fifth Circuit declined to rule that the evidence there should have been admitted under the feasibility exception to Rule 407. 695 F.2d at 889.
 
 
 43
 In our case, however, Piper was asked to stipulate to the feasibility of modifying the pitch trim switch. This Piper declined to do. It had a perfect right to decline, of course, and the ease of merely clipping the switch's springs must have been apparent to the jury; so it would have been pointless for Piper to deny the "feasibility" of that design modification. Nevertheless, the test set out by Professors Wright and Graham is sensible and even where the feasibility of remedial measures is as apparent as in our case, manufacturers should be deemed to controvert that feasibility unless they unequivocally admit it. The failure by manufacturers to clarify this factual matter for the jury will mean that evidence of subsequent remedial measures should be admitted under the controverted feasibility exception to Rule 407. The decision in our case is not grounded in this ruling, however.
 
 
 44
 The authorities and reasoning of the Eighth Circuit in Unterburger v. Snow Co., supra, and of the Wisconsin Supreme Court in D.L. by Friederichs v. Huebner, supra, provide support for the present decision. See also Oberst v. International Harvester Co., 640 F.2d at 863, 867-71 (7th Cir.1980) (Swygert, J., concurring and dissenting, in part). These decisions exemplify the limited reading given Rule 407 in strict liability cases. The Huebner opinion in particular thoroughly considers both the bases for Rule 407 and the authority relevant to applying the rule in products liability suits. Embracing the precedent which finds Rule 407 inapplicable to strict liability actions, the Wisconsin Supreme Court upholds the admission of evidence that defendant manufacturer added warning labels and metal guards to its forage chopper wagons after one of them amputated plaintiff's hand. D.L. by Friederichs v. Huebner, supra, 329 N.W.2d at 905.
 
 
 45
 This is the first time this court has directly considered the applicability of Rule 407 to a strictly liable product manufacturer. Rockwood Ins. Co. v. Clark Equipment Co., 713 F.2d 577, 579 (10th Cir.1983). We have had occasion before, however, to address Rule 407 in another context.
 
 
 46
 This court recently held in Rimkus v. Northwest Colorado Ski Corporation, 706 F.2d 1060 (10th Cir.1983) that evidence of post-accident remedial measures, the placing of crossed poles above a rock outcropping to warn skiers of a hazard, was admissible to rebut evidence of plaintiff's contributory negligence. In Rimkus we said:
 
 
 47
 Rule 407 prohibits the admission of evidence of subsequent repairs when that evidence is introduced for the purpose of proving negligence of the defendant. Where it relates to the alleged contributory negligence of plaintiff it should not be considered prejudicial. Indeed, where any other purpose exists the jury should be allowed to hear and consider the evidence. Advisory Committee's Notes, quoted in 2 Wigmore on Evidence, 283(4) (1979) at 181. Cases such as the one at bar present a recognized difficulty in applying Rule 407. "[T]he feasibility of a precaution may bear on whether it was negligent not to have taken the precaution; thus negligence and feasibility are often not distinct issues." Weinstein, supra, at 407-18.
 
 
 48
 The trial court might well have chosen to exclude the evidence. The judge was fully aware of the problem. He weighed the countervailing contentions with care. He made it plain that it was to be considered only with respect to other issues besides the possible negligence of the defendant. Thus, we see no basis for finding and concluding that the acceptance of the evidence for a limited purpose was erroneous. 706 F.2d at 1066.
 
 
 49
 Two facts distinguish Rimkus from the present appeal. First, Rimkus was a failure to warn case based on negligence; the jury's verdict in plaintiff's favor could only have been based on its determination that the ski area was negligent for failing to mark the rock outcropping and that the ski area's negligence caused Mr. Rimkus' accident. Second, the trial court in Rimkus gave the jury the following limiting instruction:
 
 
 50
 "Further, ladies and gentlemen, you are instructed that there has been evidence in this case that the area where the accident occurred was later marked by the defendant. This evidence can be considered not as to any negligence on the part of the Defendant, but only as to the feasibility of marking the area." 706 F.2d at 1064.
 
 
 51
 The trial court in the present case did not give the jury an instruction which would have precluded it from considering service Bulletin 527 as evidence of Piper's negligence or culpable conduct. Had Piper submitted a limiting instruction at the appropriate time or objected with the required specificity to the trial court's actual jury instructions, Rule 51, Fed.R.Civ.Proc., the trial court should have added such limitations to its charge to the jury.
 
 
 52
 While it would be possible to reverse on plain error grounds the trial court's omission of a limiting instruction, this court ordinarily will not exercise that power unless the error " 'may well have been a generating factor which culminated in a verdict not warranted under the law,' " Pridgin v. Wilkinson, 296 F.2d 74, 76 (10th Cir.1961) or " 'where it is apparent on the face of the record that a miscarriage of justice may occur.' 5 A. Moore's Federal Practice, p 51.04." Cited in Fox v. Ford Motor Co., 575 F.2d 774, 786 (10th Cir.1978).
 
 
 53
 Here, it was not plain error for the court to omit a limiting instruction which, had one been offered or had Piper objected to the court's charge, the court in its discretion could have used to guide the jury. Further, Piper's request for a limiting instruction prior to the three week trial following denial of its motion in limine, did not serve as a sufficient notice of its objection to the instructions. Corriz v. Naranjo, 667 F.2d 892, 896 (10th Cir.1981); Taylor v. Denver and Rio Grande Railroad Co., 438 F.2d 351, 353-54 (10th Cir.1971). See also, D.L. by Friederichs v. Huebner, supra, 329 N.W.2d at 902. (Upon request, the trial court could have fashioned an instruction limiting the jury's "use of evidence of remedial measures to the permissible purpose." Citing 23 C. Wright & K. Graham, Federal Practice & Procedure, Sec. 5291, at 155-56 (1980)); Farner v. Paccar, Inc., 562 F.2d 518, 528 (8th Cir.1977).
 
 
 54
 The Rimkus case considered above sets forth two grounds for upholding the admission of the evidence at issue now. First, Rimkus recognized that where there is any purpose for admitting evidence of subsequent repairs besides proving defendant's negligence, the jury should be allowed to hear and consider that evidence. Second, defendants who introduce otherwise unrebuttable evidence of plaintiff's contributory negligence are in a poor position to dispute admission of evidence of their subsequent remedial measures where the evidence is necessary for plaintiff to counter the contributory negligence defense. The holding here, however, rests on additional grounds.
 
 
 55
 As set forth above, the trial court refused to admit the FAA Airworthiness Directives tendered by plaintiffs. In light of the court's previous admission of Piper's service bulletins, whether the probative value of the FAA Directives was substantially outweighed by the prejudicial affect of placing such repetitive evidence before the jury was a decision within the trial court's discretion.
 
 
 56
 These directives, however, were admissible under Rule 407. Where a superior authority requires a tort feasor to make post-accident repairs, the policy of encouraging voluntary repairs which underlies Rule 407 has no force--a tort feasor cannot be discouraged from voluntarily making repairs if he must make repairs in any case. See, e.g., Rozier v. Ford Motor Co., 573 F.2d 1332, 1343 (5th Cir.1978) (trend cost estimate admissible under Rule 407 because government agency would have required it (dictum)); Lolie v. Ohio Brass Co., 502 F.2d 741, 744 (7th Cir.1974) (evidence that after the accident a state inspector required mine operators to give added support to the power cable which fell was admissible under Rule 407 because the repairs were made by a third party (but such evidence was properly excluded as cumulative); see generally Annot., Subsequent Remedial Measures, 50 A.L.R.Fed. 935, 937 Sec. 4.
 
 
 57
 Airworthiness Directives describe unsafe conditions and set forth mandatory precautions that must be taken in order to operate the affected aircraft, 14 C.F.R. Sec. 39.1; Melville v. American Home Assurance Co., 584 F.2d 1306, 1315 (3d Cir.1978). Therefore, even if this court were to rule that Piper's service bulletins were improperly admitted, in their absence the trial court's concern with the cumulative effect of admitting the Airworthiness Directives would have had no basis. Admitting those directives would place the same evidence before the jury that appellant objects to now. Thus, if admitting the bulletins was error, it was harmless error because it did not prejudice Piper. Rule 61, Fed.R.Civ.Proc., Harris v. Quinones, 507 F.2d 533, 539 (10th Cir.1974).
 
 
 58
 We have sought to outline the reasons why this court should affirm the ruling of the trial court admitting the challenged evidence. We have taken the position that under Rimkus v. Northwest Colorado Ski Corporation, supra, 706 F.2d at 1066, the rule should be narrowly construed. And so where there is any reason for use of the evidence other than to establish the defendant's negligence, Rule 407 should not apply. The reason that has been recognized is that Rule 407 excludes only evidence which is used to prove defendant's negligence or culpable conduct; its applicability in strict liability cases is not expressly provided for and has been rejected. Where there is no issue of culpability the jury's focus is only on the existence of a defect. Where plaintiffs assert both that the manufacturer was negligent and, alternatively, that strict liability standards should apply, the trial court upon request can fashion appropriate limiting instructions. D.L. by Friederichs v. Huebner, supra, 329 N.W.2d at 903-05. This view of the limited applicability of Rule 407 in a product's liability suit together with our conclusion that even if it was error to admit the service bulletin, it was harmless error because the trial court should have admitted the airworthiness directive, forms the basis of today's decision.
 
 New Mexico's Indemnity Law
 
 59
 Piper argues on appeal that the trial court misinterpreted New Mexico law regarding indemnity. Issues concerning comparative fault and indemnification among joint tort feasors are governed by state law. Kansas City Power and Light Co. v. United Telephone Company of Kansas, Inc., 458 F.2d 177 (10th Cir.1972). Here, New Mexico has recently adopted comparative fault. Scott v. Rizzo, 96 N.M. 682, 634 P.2d 1234, 1239-42 (1981). The present issue is whether New Mexico changed its indemnity law by adopting comparative fault.
 
 
 60
 Where no state court has addressed clearly the substantive legal issue, federal courts must use their own discretion to anticipate the rule state courts in similar circumstances likely would make. West v. American Telephone and Telegraph Co., 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940). The district court's views interpretive of state law carry extraordinary force on appeal where there are no controlling state decisions providing clear precedent. Hartford v. Gibbons and Reed Co., 617 F.2d 567, 569 (10th Cir.1980). Therefore, this court may overturn such decisions only where they are prejudicial and clearly erroneous. Rule 52(a), Fed.R.Civ.Proc.; Fox v. Ford Motor Co., 575 F.2d 774, 789 (10th Cir.1978); Rigby v. Beech Aircraft Co., 548 F.2d 288, 291 (10th Cir.1977); Julander v. Ford Motor Co., 488 F.2d 839, 844 (10th Cir.1973).
 
 
 61
 In February, 1981, the New Mexico Supreme Court adopted the concept of comparative negligence. Scott v. Rizzo, supra. To date, however, that court has not decided whether traditional indemnity principles remain in force notwithstanding its conversion to comparative negligence. Two New Mexico appellate court opinions have been handed down after Rizzo. These cases were decided on the basis of indemnity principles. See Stock v. Adco Gen'l. Corp., 95 N.M. 544, 632 P.2d 1182, 1186 (N.Mex.App.1981); Dessauer v. Memorial Gen'l. Hosp., 96 N.M. 92, 628 P.2d 337, 342 (N.Mex.App.1981). The language of these cases indicates adherence to traditional indemnity principles. The courts in these cases were not required to decide what effect New Mexico's newly adopted comparative negligence approach in Rizzo would have on its indemnity doctrine.
 
 
 62
 In this case, traditional indemnity principles do not, as Piper asserts, bar its indemnification of Seven Bar. As stated by the Adco court, a tort feasor (here, Seven Bar) held proximately liable for its own negligence (or, as here, the negligence of Seven Bar's employee Herndon) in failing to discover and remedy a dangerous condition created by another (here, Piper's defective switch) has been allowed indemnity. Furthermore, this allowance of indemnity "follows from a determination that the wrongdoers were not in pari delicto, that is, negligent in an equal degree, even though all may have been guilty of wrongdoing toward the plaintiff." Adco, supra, 632 P.2d at 1186.
 
 
 63
 We recognize that it would be open to the Supreme Court of New Mexico, if confronted with this issue, to determine whether comparative negligence has superseded traditional indemnity principles. It is true that when other states have adopted the comparative negligence approach, the indemnity principles in those states have changed from the traditional all or nothing approach of damages measured by the degree of comparative fault of all the parties. See Kennedy v. City of Sawyer, 228 Kan. 439, 618 P.2d 788 (1980); Tolbert v. Gerber Industries, Inc., 255 N.W.2d 362 (Minn.1977); Dole v. Dow Chemical Co., 30 N.W.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1977).
 
 
 64
 The trial court did not err in awarding Seven Bar indemnification against Piper.
 
 
 65
 Appellant raises additional issues of trial procedure in which it alleges the court erred. We have reviewed these issues carefully and find them to be without merit.
 
 
 66
 The judgments of the trial court should be and the same are hereby affirmed. It is so ordered.*APPENDIX
 
 
 67
 Several circuits have read Rule 407 to exclude evidence of subsequent remedial measures in strict liability, product manufacturers cases. To date only the Eighth Circuit has consistently and explicitly held that Rule 407 does not exclude such evidence in products liability cases. Compare Unterburger v. Snow Co., 630 F.2d 599, 603 (8th Cir.1980); Farner v. Paccar, Inc., 562 F.2d 518, 528 (8th Cir.1977); Robbins v. Farmer's Union Grain Terminal Ass'n., 552 F.2d 788, 792-95 (8th Cir.1977), with Grenada Steel Indus., Inc. v. Alabama Oxygen Co., 695 F.2d 883, 885-89 (5th Cir.1983); Hall v. American S.S. Co., 688 F.2d 1062, 1066-67 (6th Cir.1982); Josephs v. Harris Corp., 677 F.2d 985, 990-91 (3d Cir.1982); Cann v. Ford Motor Co., 658 F.2d 54, 59-60 & n. 4 (2d Cir.1981), cert. denied, 456 U.S. 960, 102 S.Ct. 2036, 72 L.Ed.2d 484 (1982).
 
 
 68
 Other circuits either have not yet decided the issue or have failed to clarify the basis for their decisions regarding Rule 407. Oberst v. International Harvester Co., 640 F.2d 863 (7th Cir.1980); Longenecker v. General Motors Corp., 594 F.2d 1283, 1286 (9th Cir.1979); Roy v. Star Chopper Co., 584 F.2d 1124, 1134 (1st Cir.1978), cert. denied, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).
 
 
 69
 The particular difficulty distinguishing strict liability from negligence in failure to warn cases against manufacturers of unavoidably dangerous drugs has caused the Eighth and other circuits to hold subsequently changed package instructions inadmissible under Rule 407. Deluryea v. Winthrop Laboratories, 697 F.2d 222, 228-29 (8th Cir.1983); Lindsay v. Ortho Pharmaceutical Corp., 637 F.2d 87, 93-94 (2d Cir.1980); Werner v. Upjohn Co., 628 F.2d 848, 856-58 (4th Cir.1980), cert. denied, 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981).
 
 
 70
 Although there is also a split of authority among state courts, far more state courts have recognized that Rule 407, or its state equivalent, has no applicability in strict liability cases. In some instances, state legislatures have clarified whether post-accident repair evidence may be admitted. Compare Alaska R.Evid. 407, Hawaii R.Evid. 407, Maine R.Evid. 407(a) (which admit evidence to show dangerous defects in products liability cases) with Ariz.Rev.Stat.Ann. Sec. 12-686(a) and Neb.Rev.Stat. Sec. 27-407 (which expressly forbid admitting evidence to prove defects against product manufacturers).
 
 
 71
 For state cases addressing the admissibility of evidence of subsequent remedial measures see generally Grenada Steel Indus., Inc., supra, 695 F.2d at 886-87 nn. 2-3; Annot., 74 A.L.R.3d 1001 (1976). Recent state cases not cited in the above include: Roberts v. May, 41 Colo.App. 82, 583 P.2d 305, 309 (1978) (post-accident automobile design changes admissible); Hartman v. Opelika Machine and Welding Co., 414 So.2d 1105, 1110 (Fla.App.1982), reh'g denied, 426 So.2d 27 (Fla.1983) (post-accident repair evidence admissible against defendant because performed by third party); Ortho Pharmaceutical Corp. v. Chapman, 180 Ind.App. 33, 388 N.E.2d 541, 558 (Ind.1979) (evidence of subsequent warning of drug side effects warning inadmissible); Millette v. Radosta, 84 Ill.App.3d 5, 39 Ill.Dec. 232, 404 N.E.2d 823, 834 (1980) (mandatory recall letter admissible); Siruta v. Hesston Corp., 232 Kan. 654, 659 P.2d 799, 808-09 (1983) (evidence of subsequent precautions not offered to prove negligence admissible in products liability cases); Carey v. General Motors Corp., 377 Mass. 736, 387 N.E.2d 583, 587-88 (1979) (post-accident automobile recall letter admissible); D.L. by Friederichs v. Huebner, 110 Wis.2d 581, 329 N.W.2d 890 (1983) (discussed in the opinion, infra); Caldwell v. Yamaha Motor Co., Ltd., 648 P.2d 519, 523 (Wyo.1982) (evidence of post-accident design change admissible).
 
 
 72
 SEYMOUR, Circuit Judge, concurring.
 
 
 73
 While I join the majority opinion in most respects, and I concur in the result, I disagree with the majority's analysis of the "indemnity" issue.
 
 
 74
 In my view, we need not address whether Seven Bar is entitled to indemnity from Piper under New Mexico law, because Piper has not "indemnified" anyone. Prior to trial, Seven Bar and O'Donnell's estate entered into an agreement wherein Seven Bar paid the O'Donnell estate $110,000 in settlement of all claims between these two parties. However, Seven Bar conditioned its agreement to pay the $110,000 in advance on O'Donnell's promise to return any portion of the settlement amount that was in excess of what the jury determined to be Seven Bar's liability. The jury found Seven Bar only 10% liable and Piper 80% liable. The jury further assessed O'Donnell's damages at $380,000. Under standard principles of comparative negligence, Piper was liable to O'Donnell for 80% of the $380,000 award, or $304,000; and Seven Bar was liable for 10% of the $380,000, or $38,000. By the terms of the settlement agreement between Seven Bar and the O'Donnell estate, Seven Bar was entitled to recover from O'Donnell the difference between the $110,000 originally paid and the $38,000 that the jury held represented Seven Bar's liability to O'Donnell. Thus, O'Donnell owed Seven Bar $72,000. As a simple accounting measure, and nothing more, the judge below merely subtracted $72,000 from the $304,000 that Piper owed O'Donnell and ordered it paid to Seven Bar, thus eliminating the need for O'Donnell to pay Seven Bar the $72,000 directly. The judge then ordered Piper to pay the remaining $232,000 to O'Donnell. In sum, Piper paid only the total amount that the jury held it was liable for--$304,000.
 
 
 75
 Even if the settlement agreement between O'Donnell and Seven Bar had permitted O'Donnell to keep the entire $110,000, Piper still would not have any right to pay less than its assigned liability. The most recent opinion of the New Mexico Court of Appeals that addresses New Mexico's contribution law, Wilson v. Galt, 100 N.M. 227, 668 P.2d 1104, 22 N.M. State Bar Bulletin 842 (June 21, N.M.App.1983), makes clear that "[i]f the settling tortfeasor paid more in settlement than his apportioned share of the total damages as determined, the injured person, without reduction, would retain the benefit of the contractually made bargain .... Reduction of the recovery against nonsettling defendants by the percentage of negligence attributable to the settling defendants, as opposed to a specific dollar amount paid in settlement, would carry out the principles laid down in Claymore [v. City of Albuquerque, aff'd sub nom, Scott v. Rizzo, 96 N.M. 682, 634 P.2d 1234 (1981) ], and Bartlett [v. New Mexico Welding Supply, Inc., 98 N.M. 152, 646 P.2d 579 (Ct.App.1982) ]." 100 N.M. at 227, 668 P.2d at 1104, 22 N.M. State Bar Bulletin at 845.[1]
 
 
 76
 Accordingly, I agree with the trial court's ultimate disposition, although for reasons different from those given by the majority.
 
 
 
 *
 The New Mexico Court of Appeals, an intermediate court, recently discussed contribution among joint tort feasors in a medical malpractice case, Wilson v. Galt, 100 N.M. 227, 668 P.2d 1104, 22 N.M. State Bar Bulletin 842 (N.M.App.1983)
 In the opinion there is discussion which is interesting but speculative regarding the state of the New Mexico law as it pertains to responsibility of joint tort feasors, but nothing that effects our case. The Wilson court's holding was finally controlled by the parties' settlement agreement, so its consideration of New Mexico's contribution law is pure obiter dictum. Apparently, if the Wilson court had been required to decide the issue it would have ruled that plaintiffs could obtain the full share of damages assessed against a non-settling joint tort feasor even though there had been a recovery by plaintiffs amounting to more than that obtained from the joint feasors who chose to settle.
 That view of the law is in accord with the result in the trial court in the present appeal. Here Seven Bar settled for more than it was found liable for by the jury. Piper argues that it should not have to indemnify Seven Bar because if it paid plaintiff O'Donnell Piper's full share of damages she would have double recovery; the Piper damage award plus the amount Seven Bar paid in excess of its liability. On the other hand, the Wilson court's view was that no such "double recovery" would shield non-settling joint tort feasors. Applied to our case that would mean that Piper cannot claim its liability should be reduced because Seven Bar settled with Mrs. O'Donnell; so the trial court under this analysis could not err by ordering Piper to indemnify Seven Bar.
 
 
 [1]
 Unlike the majority, I do not consider the Wilson discussion of New Mexico's contribution law mere obiter dictum. The court of appeals in Wilson had to make clear its rationale for affirming the trial court below. The trial court had held that the plaintiff could not recover anything from a non-settling defendant, because the plaintiff had already recovered in a settlement agreement with other defendants more than the damage award. 22 N.M. State Bar Bulletin at 844. Had the court of appeals merely affirmed, it might have left the impression that New Mexico's contribution law had remained unaffected by the recent adoption of comparative negligence principles in that state. See Claymore and Bartlett. Thus, only after clarifying the law in New Mexico could the Wilson court address the settlement agreement. Indeed, the settlement agreement was dispositive of this case only because in the court's view the law in New Mexico had changed. The Wilson decision could hardly have held the settlement agreement dispositive without some explanation why it was necessary to discuss it in the first place